UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

DIANA H. MALEC,

                          Plaintiff,

                                                    **Hon. Hugh B. Scott**

                                                    **Report**
                  vs                                **&**
                                                    **Recommendation**


                                                    03CV969A(Sc)

METROPOLITAN LIFE INSURANCE CO.,
INC., d/b/a/ METLIFE, and,
ROCCO CAPOBIANCO,

                          Defendants


        Before the Court are the following motions: defendant's motion for summary judgment

(Docket No. 52) and plaintiff's motion to strike the affidavit of Naomi Neiman (Docket No. 73).[1]


                          **Background**

        The plaintiff, Diana H. Malec ("Malec"), commenced this action alleging that the

defendants, Metropolitan Life Insurance Company, Inc. ("MetLife") and Rocco Capobianco

---

        [1]   This motion is moot.  The plaintiff brought the motion seeking to strike the affidavit on
the grounds that Neiman was not identified in the affidavit as being an employee of MetLife and
that the defendants had not otherwise identified her as an being an expert. (Docket No. 73 at ¶¶
8-10).  The defendants response makes it clear that Neiman is employed by MetLife as a records
custodian (Docket No. 88 at ¶¶ 4-6) and the plaintiff agrees that any deficiency in Neiman's
affidavit has been cured. (Docket No. 93 at page 2).

("Capobianco") discriminated against her on the basis of her gender and retaliated against her in

violation of her rights under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.)

and the New York State Human Rights Law ("NYHRL").  In addition, the plaintiff claims that

the defendants paid her less than comparable male employees in violation of the Equal Pay Act

(29 U.S.C. § 206 et seq. ["EPA"]) and various sections of the New York State Labor Law.

Finally, the plaintiff asserts a state law claim for the tortious interference with prospective

economic advantage.


**Relevant Corporate Structure at MetLife**

The highest ranking MetLife local manager is the "Managing Director", who hires and

supervises all the other managers.  MetLife also employs "Agency Directors" [AD's], individuals

with full-time management duties.  Some AD's specialize by function (i.e. a "Sales Director"

supervises and trains sales representatives; a "Recruiting Director" focuses on recruiting new

sales representatives.)  Other assistant managers are entitled "Functional Managers" [FM's] who

spend part of their time on management duties while also working as a sales representative.

(Docket No. 51 at page 3-4).    According to MetLife, not all FM's have the same duties; some

have managerial responsibilities that consume a significant portion of their work week, others

may have duties that require a few hours per month. (Docket No. 39 at ¶ 10).  Some FM's also

serve as product specialists with expertise in a particular type of insurance or financial services

product.  (Docket No. 39 at ¶ 13).  Further, it appears that the local agency has flexibility as to the

use of titles; an individual may be referred to as the "Training Director" but the official corporate

MetLife title is an "Agency Director."  (Docket No. 39 at ¶ 7).

2

It appears that most individuals start at MetLife in some form of sales representative capacity. Compensation for that position is largely based upon commissions.  In addition to any commissions, managers, both AD's and FM's, receive a management salary which is negotiated between the manager and the local Managing Director and paid from a local agency fund called the "PBC".[2]   (Docket No. 39 at ¶ 24).  During the years relevant to this case, MetLife also had a mentor program in which some MetLife employees serve as mentors to newer sales representatives.  Thus, an FM's might also be a mentor and receive a total "management salary" that consists partly of "mentor salary" and partly of  "FM salary." (Docket No. 39 at ¶ 25).  In 2000 and 2001, a Managing Director had an incentive to designate as much as possible of an individual's total management salary as being "mentor salary" because only 40% of those payments would come from the local agency's PBC, with the rest being paid by MetLife's corporate office.  The entirety of the "FM salary" had to come from the local agency's PBC. (Docket No. 39 at ¶ 26-27).

As discussed below, Malec served as both an FM and a mentor during the years relevant to this action.

_____

[2]   MetLife states that pursuant to a formula, each agency generates a certain amount of "PBC" based upon each year's results.  The PBC pool of money is available to pay the agency's managers. It appears that the Managing Director has considerable discretion regarding the allocation of these monies among the various managers and gets to keep the amount left over after payment of all other managers.  (Docket No. 39 at ¶ 24).

**Malec's MetLife Employment History**

Malec asserts that prior to being employed by MetLife she had earned a baccalaureate degree as a pre-medical school student at Canisius College in 1973. (Complaint at ¶ 30).[3]  She began her employment with MetLife in 1977 as a "Financial Services Rep." (Complaint at ¶ 31). According to Malec, since 1980 she repeatedly expressed interest in management positions in conversations with her Branch Manager and Regional Manager. (Complaint at ¶ 33).  In 1982, Malec took a maternity leave for the birth of her second child. (Complaint at ¶ 35).[4]  In 1983, Malec asserts that she received training to handle complex underwriting cases as well as licensing to sell variable products and mutual funds. (Complaint at ¶¶ 36, 37).  Malec received  numerous awards for sales achievement and other functions while at MetLife.[5]

According to Malec, in 1988 she was temporarily "promoted" to the position of Associate

---

[3]  She attended three years of medical school in Warsaw, Poland from 1973 to 1975. (Complaint at ¶ 30).

[4]  As discussed below, most of the plaintiff's claims in this matter relate to events which took place in or after 2001. The plaintiff's child born in 1982 would have been approximately 19 years of age at that time.  The plaintiff makes no allegation that her responsibilities as a parent influenced her production at MetLife or interfered in her ability to perform any of the duties assigned to her by her superiors at MetLife.

[5]  In 1984, the plaintiff alleges that she became the first female member of the Sales Advisory Council for the Western New York region and that she was awarded  MetLife Leaders Conference awards in 1987, 1989, 1992-2001;  Buffalo Achiever's Club awards in 1988, 1989 and 1990-1992; the GAMA Agent of the Year award in 1989; and the top Branch Producer award in 1989.  (Complaint at ¶¶ at 43-44, 55, 56, 58).  In 1993, Malec became a member of the MetLife Million Dollar Round Table and was among the Top 100 Annuity Producers in MetLife's northwestern territory. (Complaint at ¶ 64).  From January 1993 to April 1995, Malec served as a member of the Regional Sales Advisory Council.  The plaintiff asserts that she also qualified for the Million Dollar Round Table in 2000 and 2001. She earned MetLife's Triple Crown award for productivity in 2001. (Complaint at ¶¶  65, 78, 80).

Branch Manager in the Walden Branch Office. (Complaint at ¶ 46).[6]  During this time, Malec

asserts that she discussed her wish for additional promotion with Greg Patraetis, her Branch

Manager.[7]   In October of 1988, Malec was demoted back to the Financial Services Rep. position.

(Complaint at ¶ 53).[8]   The plaintiff alleges that in 1991 she developed psoriasis which her

physician attributed to job-related stress. (Complaint at ¶ 59).   In May of 1992, Malec asserts that

she asked for a meeting with her Regional Manager, Michael Vietri, to again ask about a

promotion.[9]   The plaintiff also alleges that she met with then-Regional Sales Manager  James

Sinni in 1994 about possible promotions (Complaint at ¶ 66).[10]

In 1994, Malec asserts that she met with her new branch manager, Donald March, and

asked for a promotion. (Complaint at ¶ 69).[11]   The Court notes that March is not a defendant in

---

[6]   The plaintiff states that this promotion was "in name only" and claims she was denied
the same compensation and financial resources that were received by similarly situated male
employees. (Complaint at ¶ 47).

[7]   Malec asserts that Patraetis advised her that she could not be promoted because her
child care responsibilities would prevent her from devoting the necessary time to the position.
(Complaint at ¶ 51)

[8]   The plaintiff asserts that her demotion was "ostensibly" due to a lack of funding.
(Complaint at ¶53).  This representation is somewhat inconsistent with the plaintiff's claim that
her temporary promotion was "in name only" (Complaint at ¶  47).

[9]   According to the plaintiff, Vietri advised Malec that she was not playing "the corporate
game" by going over her Branch Manager's head to seek a promotion and that because she was a
single parent she would be unable to devote sufficient time to management due to her child care
responsibilities.  (Complaint at ¶¶ 60-62).

[10]   The Court notes that neither Patreais, Vietri or Sinni are defendants in this case and
claims in this action do not encompass the plaintiff's failure to be promoted by these individuals.

[11]   Malec asserts that she asked March to promote her to the branch manager position in
Letchworth, New York. (Complaint at ¶ 71). According to the plaintiff, the position was instead
given to a male, Glen Smith. (Complaint at ¶ 72).  The plaintiff further asserts that in March of

this action and that the plaintiff's claims do not include the failure to be promoted by March. Indeed, the plaintiff represents that she had "an excellent working relationship" with March. (Docket No. 70 at page 5).

In 2001, Malec came under the supervision of Capobianco.  Malec asserts that on a number of occasions she asked Capobianco for promotions, including in December of 2001 when she requested a promotion to a Director of Sales position, but was told by Capobianco that she would not want to work the necessary hours for the position.  (Complaint at ¶ 87).  Capobianco denies that any of his promotion decisions were influenced by gender.  He points out that at the time Malec filed the instant action, fully half of his full-time management team was comprised of females:

| | | |
|---|---|---|
| Marketing Director | Erin Diegelman | female |
| Operations Manager | Collette Forrest[12] | female |
| Recruiting Director | Kathy O'Scier | female |
| Sales Directors | Gabe Sorgi | male |
| | James Battistella | male |
| Training Director | Abe Gibbons | male |

(Docket No. 39 at ¶ 14).


**Malec's Relationship with Capobianco**

Almost all of Malec's claims appear to relate to her relationship with Capobianco.  After the 1998 merger of the Buffalo and Orchard Park MetLife agencies, March and Capobianco were

---

1998, she asked March to assign her to the position of Associate General Manager in the Rochester, New York branch. Malec states that the position was given to a male, Robert Sass. (Complaint at ¶¶ 73-74).

[12]  Capobianco also refers to Forrest at the agency's Chief Financial Officer ("CFO"). (Docket No. 39 at ¶ 16).

Co-Managing Directors of the single agency.  March states that he and Capobianco had

significantly different management styles which conflicted and led to many disagreements

between them, some of which involved Malec. (Docket No. 44 at ¶¶5-10).  March states that his

"management style was to keep sales reps motivated by constantly giving them a pat on the back,

telling them they were doing great" (Docket No. 44 at ¶ 5); whereas, according to March,

Capobianco "focused mainly on bottom line results, not on people's feelings." (Docket No. 44 at

¶ 6).  March states that by 2001, his disagreements with Capobianco reached the point where he

did not feel they could continue to function as Co-Managing Directors.  With the approval of

MetLife's Regional Vice President, March stepped down from Co-Managing Director to

Recruiting Director because he thought it might help alleviate the constant conflicts between

himself and Capobianco. (Docket No. 44 at ¶ 11).

      The record reflects that March and Malec were not the only ones at MetLife who did not

appreciate Capobianco's style. Like March, former MetLife Sales Director Charles Gleba did not

always get along with Capobianco.  Gleba states: "Rocco Capobianco was a very intimidating

supervisor at MetLife.  I found him to be tough, but fair.  I did not always like his approach, or

how he talked to me.  I understand why he acted the way he did: he was very focused on the

bottom line results, and did not appear to worry much about people's feelings.  I voluntarily

resigned from MetLife in August 2002, after less than one-and-a-half years on the job." (Docket

No. 43 at ¶ 17).

      Similarly, another former MetLife Sales Director, Gabe Sorgi, gives this assessment of

working with Capobianco: "I put up with Rocco as best I could, but I found him very difficult to

work for. [March] was a 'people person.' Rocco, on the other hand, was a bottom line results

guy; he didn't seem to worry about hurting people's feelings. Rocco  was very blunt.  He didn't

swear or use inappropriate language, but he often let you know in no uncertain terms that he was

not happy about something, and he usually wasn't interested in hearing your explanation.  Most

of the time, I just listened quietly when he vented. I felt that was the politically prudent thing to

do.  From what I observed, most other managers at the agency reacted the same way I did.  But

Diana Malec did not.  She often argued back." (Docket No. 46 at ¶ 35).   Sorgi voluntarily gave

up the Sales Director position and returned to being a sales rep in 2004. (Docket No. 46 at ¶ 36).

Finally, Bruce Supernault, yet another individual who briefly worked under Capobianco as a

Sales Director, stated that he "found Capobianco to have a driving personality and at times he

was challenging to work with."  (Docket No. 63 at ¶ 9).[13]

       With respect to the relationship between Capobianco and Malec, March states: "both

Rocco and Diana are very strong willed. Rocco clashed with a number of people, male and

female, but Diana argued back with him more than anyone else at the agency.  During her final

year with us, I advised Diana to consider transferring to another MetLife agency.  By then, it was

obvious that she was demoralized and unhappy. She did not make a secret of that fact.  It also

showed in her production, which declined markedly." (Docket No. 44 at ¶ 27).

       In any event, until 2001, March, and not Capobianco, supervised Malec and negotiated

salary and compensation terms with her. (Docket No. 44 at ¶ 7).   According to March, he and

Malec simply agreed upon a total dollar figure for her duties as an FM and mentor, and left it up

to Capobianco to decide how much of the total figure to allocate between the FM and mentor

---

       [13]   Supernault, who submitted an affidavit on behalf of Malec, stated that he left MetLife,
in part, because the financial arrangement he had was only guaranteed for one year and the new
offer was "drastically altered" such that the terms were unacceptable. (Docket No. 63 at ¶ 10).

designation. (Docket No. 44 at ¶ 26).    According to March, Malec wanted some management

duties so that she could earn a management salary but did not want those duties to get in the way

of her ability to service her existing clients and to continue to make new clients because she

earned more than $100,000 per year in sales commissions and related bonuses. (Docket No. 44 at

¶ 7). [14]

One of the conflicts between March and Capobianco related to Malec's attendance at

group phone sessions on Thursday evenings and Saturday mornings.  Capobianco wanted all

FM's, like Malec, to help supervise group phone sessions on both Thursday evenings and

Saturday mornings.  According to March, Malec told him that those were good times for her to

meet with clients, so March agreed that he would not require her to attend those sessions.

(Docket No. 44 at ¶ 8).  Similarly, March states that Capobianco wanted all FM's to participate in

the management team meetings on Friday afternoons.  Everyone on the management team was

expected to be there. According to March, on several occasions Malec advised March that she

needed to "unwind and relax" on Friday afternoons and that she was not going to attend the

meetings.  March asserts that Capobianco was "less than pleased" with Malec's failure to attend

these meetings. (Docket No. 44 at ¶ 9).  Given Malec's desire to preserve a significant amount of

time for selling new business and servicing her clients, March states that in his opinion there was

---

[14]    For example, March testified that his duties as Recruiting Director left very little time
for generating new sales. He states that in 2002, he earned only $5,113 in first year commissions
("FYCs").  In 2003, he decided to step down to become an FM with only part-time management
duties because he believed that by freeing up more time he could increase his total income.  He
claims that in 2004, his first full year as an FM, he earned $96,505 in FYCs.  March states that
this shows the difference between the time demands of a full-time management job versus an FM
role.  According to March, he "didn't suddenly become a better salesperson in 2004; rather, [he]
had more time available to sell." (Docket No. 44 at ¶¶  22-23).

no way Malec could have handled a full-time management job, such a Sales Director's position. (Docket No. 44 at ¶ 10).[15]   March stepped down as Co-Managing Director in 2001, but continued on at MetLife in the capacity of Recruiting Director. (Docket No. 44 at ¶ 11).   In her affidavit in opposition to the instant motion, Malec states that she was "often" in the office during the Thursday phone sessions and "almost always" attended the Friday office meetings. (Docket No. 57 at ¶ 10).   Malec's affidavit does not represent that she was present at the Saturday morning sessions.   In her Memorandum of Law in opposition to the instant motion, she acknowledges that her attendance at the Thursday evening meetings was not regular stating that "she chose to service her own clients at a time which was convenient for the clients, but conflicted with Capobianco's Thursday night phone sessions." (Docket No. 70 at page 6).

March also states that Malec would "regularly" visit the casino in Niagara Falls and that she invited him to go with her. (Docket No. 44 at ¶ 9).   Capobianco states that he was told by March and Sorgi that Malec would not attend the Friday afternoon management meetings because she preferred to spend Friday afternoons at the casino. (Docket No. 39 at ¶ 22).   In his affidavit in support of the instant motion, Sorgi reaffirms that on a number of occasions Malec would call the office to say that she would miss the management team meeting and that on these occasions "she was having lunch at a casino in Niagara Falls or was stuck in traffic trying to return from that casino." (Docket No. 46 at ¶ 37).   The plaintiff does not dispute that she occasionally frequented casinos but claims that Capobianco has magnified it into a character

---

[15]   March stated that Gabe Sorgi, who held that title, often spent more than 50 hours a week performing management duties associated with that position.   March characterized Sorgi as a good salesperson, but that while he was Sales Director he averaged less than $10,000 per year in sales commissions. (Docket No. 44 at ¶ 10).

flaw. (Docket No. 70 at page 6).   Indeed, at least two of Malec's clients/acquaintances have

submitted affidavits suggesting that Malec's recreational activities at casinos did not distract her

from her work or make her unfit to provide financial advice. (See Affidavit of Virginia Grabiner,

Docket No. 59 at ¶ 7[16]: Affidavit of Christine Mathews, Docket No. 60 at ¶ 6).  Referring to

herself and Malec, Mathews, a tax accountant who worked with Malec, states that although

"[b]oth of us also enjoy gaming at our local casino on occasions" (Docket No. 60 at ¶ 6);

Malec's activities in this regard have not affected Malec's professional performance in any way.

(Docket No. 60 at ¶¶ 7-9).  According to Lesa Van Son, who worked at MetLife from 1998 to

2001, she attended  "Friday staff meetings" and that Malec was present at the Friday meetings

every time Van Son was there. (Docket No. 64 at ¶¶ 16-17).[17]

        The record reflects that, although the plaintiff asserts that Capobianco favored male

employees,  Malec[18]  does not allege that Capobianco ever made any comment to her which

---

[16]   Grabiner testifies that she is aware that Malec was "forced to declare bankruptcy."
Grabiner does not suggest that Malec's bankruptcy is related to her gambling activities at
casinos.  (Docket No. 59 at ¶ 11).

[17]   It is not clear from the record whether the "Friday staff meetings" referred to by Van
Son were the same as the "management team meetings" referred to by Capobianco and March.
Also, the record does not reflect how regularly Van Son attended these meetings. Van Son states
that she left MetLife shortly after the Orchard Park office merged with the Greater Buffalo
Agency. (Docket No. 64 at ¶¶ 38).

[18]   In her papers filed in response to the instant motion, the plaintiff's counsel
characterizes as "sexual innuendo" (Docket No. 70 at page 7) the fact that *in his affidavit in
support of the instant motion*  Capobianco states: "In my opinion, March gave Malec a
sweetheart deal for her management role." (Docket No. 39 at ¶ 21, 23).  The Court notes that the
plaintiff does not state that Capobianco used this language other than in the context of his
supporting affidavit.  Further, from the context of the affidavit, it is clear that Capobianco used
the phrase "sweetheart deal" to reflect that the terms of the deal – both in compensation and the
fact that March excused Malec from having to attend the Thursday evening and Saturday
morning sessions – was advantageous to Malec.  Id. The Court takes judicial notice that the term

would suggest that he had a negative view of woman managers or women in general. (Malec

Deposition, Docket No. 49 at pages 85-86).[19]

### Malec's Compensation and
### the Elimination of her Position

In addition to her failure to promote claims, Malec asserts that she was paid less for

comparable work than male employees at MetLife.  Much of Malec's total compensation was

dependant upon her annual production of FYCs. As noted above, in addition to commissions,

Malec received managerial salary for her work as an FM and as a mentor.  In 2001, she

---

"sweetheart deal" is now common in business parlance.  The Court finds that no reasonable trier
of fact could read those portions of Capobianco's affidavit and conclude that the term was being
used as a "sexual innuendo" to describe Malec's relationship with March.

[19]   The plaintiff has presented an Affidavit from Ninette Dusenberry, a client of Malec's
who interviewed with Capobianco for a position at MetLife in 1998 or 1999.  Dusenberry found
Capobianco to be "extremely condescending" during the interview and "made a comment to the
effect that women should not be out working but staying home taking care of their children."
(Docket No. 58 at ¶ 3-4).  Dusenberry's Affidavit does not the exact words of Capobianco in this
regard. The record also contains the Affidavit of Lesa Van Son, an ex-MetLife sales rep.  She
states that at one regional meeting prior to her working with Capobianco, Capobianco had told
her she "would never make it in his office." (Docket No. 64 at ¶ 7).  When she did work with
Capobianco after the merger of the two MetLife agencies, she stated that Capobianco did nothing
to support her and that he gave leads to "the male reps." (Docket No. 64 at ¶ 22). Van Son stated
that she never saw any male managers "stand up to" Capobianco, but that Malec was willing to
"stand up for what she believed was right."   (Docket No. 64 at ¶¶ 40-41). She asserts that
because of this, Malec was called "a bitch and argumentative." (Docket No. 64 at ¶ 41).  Van Son
does not allege that Capobianco made these comments.  In fact, Van Son fails to state who is
alleged to have made the comments and under what circumstances the comments were made.
Finally, Malec points to the deposition of Donna Morley, a sales associate who at one time
worked as March's secretary.  According to Morley, while she felt that Capobianco treated
clerical staff (which was predominantly female) with less respect than he treated sales reps, she
could not state that she had observed him treat female employees differently than male
employees. (Docket No. 71 at pages 62-64).

negotiated a total managerial salary with March of $1000 per week, leaving it up to Capobianco

to determine how much of the salary was allocated as FM salary (and thus paid entirely out of the

local PBC) and how much would be designated as mentor salary (of which only 40% was

charged against the PBC). The documents in the record reflect that in 2001, Capobianco

designated $800 of the $1000 total as being mentor salary; and $200 as being FM salary. (Docket

No. 39, Exhibit C, Page 27).

Also in 2001, Capobianco states that his superiors encouraged him to switch to an

incentive based system regarding management compensation. Thus, according to Capobianco, he

and Collette Forrest created an incentive system of largely driven by "overrides" – under which a

manager gets paid a percentage of the commissions earned by the sales reps he or she supervises.

The incentive formula also included other adjustments for recruiting and retention. Capobianco

states that the "idea is to give the assistant manager a percentage of the PBC his/her group

generates for the agency, in other words, to tie their compensation to their unit's performance and

their recruiting results." (Docket No. 39 at ¶ 40-42). Capobianco stated that in most cases the

override formula "significantly reduced assistant managers' pay compared to the straight salary

deals March (and occasionally [he]) had negotiated with them in the past." (Docket No. 39 at ¶

43).

Capobianco states that early in 2001, he told Malec that he wanted to convert her

management pay from a straight salary to an override formula.[20] He asserts that he had done the

same with other assistant managers, such as Dominic DiCenzo. According to Capobianco, Malec

_____

[20]   Capobianco states that this would have eliminated the "sweetheart deal" March gave
Malec and would have tied her management pay to the results she and her group achieved.
(Docket No. 39 at ¶ 44).

objected to the conversion and he did not force her (or anyone) to switch in 2001.  In 2002,

Capobianco states that he made the override system of management compensation mandatory for

Sales Directors and FMs who helped supervise a unit.  (Docket No. 39 at ¶ 44).

In late 2001, Capobianco calculated how much management pay Malec would have

earned under the override formula and determined that it was less than $10,000. Her actual

management salary that year was nearly $50,000.  Capobianco concluded that he lost money by

paying her to be a manager that year.  (Docket No. 39 at ¶ 44-45).  Malec does not dispute

Capobianco's assertion that he and/or the agency lost money by paying her a management salary

in 2001. (Docket No. 68 at ¶ 39).  During this same period, Capobianco decided to eliminate

Malec's management position in its entirety. (Docket No. 39 at ¶ 53).  Capobianco describes his

thought process as follows:

> It is always part of my duties to take a look at whether my
> agency is staffed efficiently. 2001 was a particularly good time for
> me to re-examine our staffing, both because Forrest had developed
> some tools to help me analyze the value we were getting, and
> because March had agreed to step down as Co-Managing Director,
> so I no longer had to fight with him over changes I wanted to
> make.
> The only one I left completely intact was Glofka's.  From
> the outset of the year he had been assigned to work as Sorgi's
> assistant.  For example, in a give week Sorgi went on as many joint
> sales as he could with people in his unit.  But if he didn't have time
> to go out with everyone in his unit, he assigned Glofka to fill the
> gap.  That arrangement was working well. The two of them worked
> well together and Glofka was doing a good job.
> Around October 2001, I modified DiCenzo's FM role, but
> did not eliminate it.  Earlier, he worked pretty independently with
> an assorted group of 5 to 8 sales reps, just as Malec and DiRamio
> did. But in October, I assigned Di Cenzo to be Chales Gleba's
> assistant (Gleba was another Sales Director).  DiCenzo's role was
> parallel to Glofka's; he just assisted a different Sales Director.
> Because Glofka and DiCenzo were each assigned to assist a

specific Agency Director with that Director's unit, I began
referring to them as "Associate Agency Directors."  That was not
an official title recognized by MetLife, nor was it a promotion.  It
was just my way of describing the fact that now they were
associated with a specific Agency Director.

Towards the end of 2001, I decided to eliminate all Mentor
positions at my agency.  In my opinion, that program is a waste of
money.  The co-opposition feature (that a portion of the salary was
paid by MetLife's corporate office) was nice, but home office was
phasing that out, and paying someone a large salary to work with
just one sales rep is rarely cost effective.

Based on all the factors described above, in late 2001, I
decided to eliminate Malec's management position.  I already had
eliminated Jones' and DiRamio's.  In a nutshell, her performance
as an FM and Mentor was poor in 2001; I was losing money by
paying her such a large salary; and she did not seem to be
interested in cooperating with me (not attending the phone
sessions, not switching to overrides, missing meetings, etc.).

Also, I view this type of FM position as a training ground
for future Sales Directors.  It's our "bench" from which we hope to
develop a few "starters."  Malec's unwillingness to work the phone
sessions, etc., ruled her out as a potential Sales Director, so having
her occupy an FM position was not a promotion the training
ground goal."

(Docket No. 39 at ¶¶ 48-53).

Malec disputes that Capobianco eliminated all mentor positions, stating that "[t]o the best

of plaintiff's knowledge, hers was the only mentor position to be eliminated at [that] time."

(Docket No. 68 at ¶ 35).  The compensation records produced by MetLife, however, reflect that

only Malec received a mentor salary in 2001. (Docket No. 39, Exhibit C at page 27).  Malec does

not point to evidence that any male FM received a mentor salary in 2001 or thereafter.  She also

disputes that Capobianco eliminated three FM positions in 2001, on the grounds that her position

was not actually eliminated until 2002.  She acknowledges that DiRamio's and DiCenzo's

position were eliminated, stating that DiRamio resigned to work for another company and

15

DiCenzo died. (Docket No. 68 at ¶36).  Malec admits that her performance as a manager in 2001 "was not better than fair," but states that this was so because Capobianco placed her in charge of a group of people without any input from her regarding selection, and kept shifting people in and out preventing her from achieving any consistent work with her group. (Docket No. 68 at ¶ 37).

Capobianco notified Malec that he intended to eliminate her management position effective at year-end.  Before that change became effective, DiCenzo died.  Malec expressed interest in DiCenzo's position.  Capobianco stated that he initially offered to let her try it on a trial basis, so long as she was willing to meet the job requirements (such as supervising phone sessions) and willing to go on an incentive based compensation plan. He stated that he interviewed her for the position, but that they "never reached agreement over issues such as whether she would supervise phone sessions, or a formula for her compensation." (Docket No. 39 at ¶ 54). Capobianco states that he decided that it wasn't necessary to replace DiCenzo and that he did not replace him. (Id.)  Malec admits that Capobianco decided not to replace DiCenzo. (Docket No. 68 at ¶ 40).  It is undisputed that the changes in the management compensation formula and the elimination of Malec's management and mentor positions significantly affected her total compensation in 2002 and thereafter.

**Retaliation Allegations**

The plaintiff asserts that she has been subjected to adverse employment action since she filed a claim of employment discrimination with the Equal Employment Opportunity Commission ("EEOC") in May of 2002.  In this regard, Malec asserts, inter alia, that she was given leads for the "Deliver the Promise" program more than twenty miles from her branch office

16

and that local leads were assigned to males; when she complained about the disparity, she was

removed from the "Deliver the Promise" program; the plaintiff's secretary was reassigned to two

males; Capobianco allegedly refused to sign Malec's bonus check for the second quarter of 2002;

Capobianco purportedly transferred $685,000 from one of Malec's client's portfolio's to his own

book of business without the client's permission; she was charged for the entire bill for alcohol

consumed at a seminar in October of 2003 and was orally reprimanded by Capobianco for

complaining about the bill; that in November of 2003 she received a written warning from

Capobianco criticizing her for a lack of professionalism in the office after she used the phrase

"pissed off" even though male employees routinely used more offensive profanities without

reprimand; and that throughout 2003, Malec was burdened with unproductive paperwork and

deprived sales support that resulted in a reduction in her gross income. (Complaint at ¶ 102 a-m).


### Statute of Limitations

The plaintiff acknowledges that several of the allegations relate to events beyond the

applicable statutes of limitations in this matter.  Malec has stipulated that her Title VII claims do

not extend to acts which took place prior to 180 days before she filed her EEOC charge, but only

to acts or decisions that occurred on or after December 1, 2001.  Similarly, the plaintiff's EPA

claims related only to her compensation on or after December 31, 2001; her NYHRL claims

concern acts on or after December 31, 2000; her New York Labor Law claims encompass

compensation issues on or after December 31, 1996; and her tortious interference claims related

only to acts on or after December 31, 2000.  Finally, the plaintiff stipulates that she is

maintaining only two claims against Capobianco: a tortious interference claim and that he "aided

17

and abetted" in a violation of the NYHRL.  (Docket No. 19)

The defendants have moved for summary judgment as to all of the plaintiff's claims.


### Discussion

### Standard of Review

Summary judgment is appropriate where there are no issues of material fact in dispute, and the moving party is entitled to judgment as a matter of law.  See Trans Sport, Inc. v. Starter Sportswear, Inc., 964 F. 2d 186, 188 (2nd Cir. 1992) citing Bryant  v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).  To prevail on its summary judgment motion, the moving party must show that "there is no genuine issue as to any material fact" and that it "is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, we "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Cifra v. General Electric Co., 252 F.3d 205, 216 (2d Cir.2001).

In discrimination cases, the inquiry into whether the plaintiff's sex or race caused the conduct at issue often requires an assessment of individuals' motivations and state of mind, matters that call for a "sparing" use of the summary judgment device because of juries' special advantages over judges in this area. . Distasio v. Perkin Elmer Corp., 157 F.3d 55, 61 (2d Cir.1998); accord Gallagher v. Delaney, 139 F.3d 338, 342 (2d Cir.1998) (noting juries' possession of the "current real-life experience required in interpreting subtle sexual dynamics of the workplace based on nuances, subtle perceptions, and implicit communications").

Nonetheless, an employment discrimination plaintiff faced with a properly supported summary judgment motion must "do more than simply show that there is some metaphysical

doubt as to the material facts," <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574,

586 (1986). See <u>Distasio</u>, 157 F.3d at 61. She must come forth with evidence sufficient to allow a

reasonable jury to find in her favor. See <u>McCarthy v. New York City Technical College</u>, 202

F.3d 161, 167 (2d Cir.2000).  In this regard, the non-moving party must, "demonstrate to the

court the existence of a genuine issue of material fact." <u>Lendino v. Trans Union Credit</u>

<u>Information</u>, Co., 970 F.2d 1110, 1112 (2nd Cir. 1992), citing <u>Celotex Corp. v. Catrett</u>, 477 U.S.

317, 324 (1986).  A fact is material:

> when its resolution would "affect the outcome of the suit under the
> governing law" and a dispute about a material fact is genuine "if
> the evidence is such that a reasonable jury could return a verdict
> for the non-moving party."

<u>General Electric Company v.  New York State Department of Labor</u>, 936 F.2d 1448, 1452 (2nd

Cir. 1991), quoting <u>Anderson v.  Liberty Lobby, Inc</u>., 477 U.S. 242, 248 (1986).

Even where facts are disputed, in order to defeat summary judgment, the nonmoving party

must offer enough evidence to enable a reasonable jury to return a verdict in its favor. See

<u>Anderson</u>, 477 U.S. at 248; <u>Scotto v. Almenas</u>, 143 F.3d 105, 114 (2d Cir.1998). Thus the "non-

moving party may not rely on conclusory allegations or unsubstantiated speculation." <u>Byrnie v.</u>

<u>Town of Cromwell, Bd. of Educ</u>. 243 F.3d 93, 101 (2d Cir. 2001). "The non-moving party must

come forward with enough evidence to support a jury verdict ... and the ... motion will not be

defeated merely ... on the basis of conjecture or surmise."  <u>Trans Sport</u>, supra, 964 F.2d at 188.

Summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational

trier of fact to find for the non-moving party." <u>Nippon Fire & Marine Ins. Co., Ltd. v. Skyway</u>

<u>Freight Systems, Inc.</u>, 235 F.3d 53 (2nd Cir. 2000) quoting <u>Matsushita Elec. Indus. Co. v. Zenith</u>

<u>Radio Corp.</u>, 475 U.S. 574, 587 (1986).

**Title VII Shifting Burdens**

Under the burden-shifting analysis outlined in McDonnell Douglas Corp. v. Green, 411

U.S. 792 (1973), a plaintiff first must establish a *prima facie* case of discrimination based on

gender. See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981);

McDonnell Douglas, 411 U.S. at 802.  To establish a *prima facie* case of gender discrimination,

the plaintiff must satisfy the following four elements: (1) that plaintiff falls within the protected

group, (2) that plaintiff was qualified for the position, (3) that plaintiff was subject to an adverse

employment decision and (4) that the adverse employment decision was made under

circumstances giving rise to an inference of unlawful discrimination.  McDonnell Douglas, 411

U.S.  at 802 ; Fisher, 114 F.3d at 1335.

If the plaintiff establishes a *prima facie* case of gender discrimination, the burden shifts to

the employer to articulate a legitimate, non-discriminatory reason for the challenged employer

action. McDonnell Douglas, 411 U.S. at 802.  If the defendant proffers such a reason, the

presumption of discrimination created by the *prima facie* case drops out of the analysis, and the

defendant "will be entitled to summary judgment ... unless the plaintiff can point to evidence that

reasonably supports a finding of prohibited discrimination." James v. N.Y. Racing Ass'n, 233

F.3d 149, 154 (2d Cir.2000) citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 519-524 (1993);

see also McDonnell Douglas, 411 U.S. at 804; Fisher v. Vassar College, 114 F.3d 1332, 1336 (2d

Cir.1997) (en banc), *cert. denied*, 522 U.S. 1075 (1997). The  plaintiff "must be afforded the

opportunity to prove by a preponderance of the  evidence that the legitimate reasons offered by

the defendant were not its true reasons but were a pretext for discrimination." Reeves v.

<u>Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 142-43 (2000)

**Malec's Failure to Promote Claim**

The plaintiff asserts that on a number of occasions she requested promotion to a management position within the limitations period applicable to her claims.  According to the defendants, during discovery Malec asserted that she should have been promoted on eight occasions: as the Recruiting Director in January of 2002; as the Training Director in October of 2001 and September of 2003; as a Functional Manager in January of 2001, February of 2001 and February of 2004; and as Sales Director in October of 2001, July of 2002 and February of 2003.  (Docket No. 51 at page 11).  It is not clear from the record as to whether these positions were posted prior to being filled, and if so, whether  Malec actually applied specifically for any of them.

At the outset, the Court notes that Malec contends that the defendants have "conceded that the plaintiff has stated a prima facie case on her failure to promote claim." (Docket No. 70 at page 16).  In this regard, the plaintiff cites to page 45 of MetLife's Supporting Brief, Docket No. 51. However, the defendants do not make any such concession on page 45 of  Docket No. 51 (or elsewhere that the Court has been able to discern).  The discussion on page 45 of MetLife's Supporting Brief deals with the plaintiff's EPA claim, not her failure to promote claims.  In any event, at that page MetLife states that the facts "arguably preclude[] plaintiff from establishing the first element of a *prima facie* case." (Docket No. 51 at page 45, n.1).

Recruiting Director.  It is undisputed that Don March served as co-Managing Director

with Capobianco from 1999 to 2001.  It appears that having co-Managing Directors was not

working well, and in 2002 MetLife created the position of Recruiting Director for March who

volunteered to step down as co-Managing Director. (Docket No. 44 at ¶¶ 11-12).  The record

reflects that recruitment had been a primary responsibility for March at MetLife prior to the

creation of the position. (Docket No. 44 at ¶¶ 2-4).  He had developed a broad network of

contacts that produced between 100 and 200 new candidates each week.  (Docket No. 44 at ¶¶

17-19).  Any MetLife employee could recruit someone, and it appears that Malec occasionally

referred a candidate to her managers. (Docket No. 51 at page 15).  At her deposition, however,

Malec conceded that March had more recruiting experience than she did.  (Docket No. 49, Malec

Deposition at page 239).  In her papers in response to the instant motion, Malec articulates no

basis which would raise a question of fact that she was better qualified for the Recruitment

Director's position than March or that gender played any role in the determination to appoint

March to that position.   Significantly, the record reflects that in 2003, March stepped down as

Recruitment Director and was replaced by a female, Kathy O'Scier. (Docket No. 51 at page 14).

The plaintiff has failed to establish a prima facie case of discrimination with respect to her failure

to be promoted to the position of Recruitment Director. To the extent that Malec's claims are

based upon a failure to be promoted to that position, the defendants motion for summary

judgment should be granted.


Training Director.  It appears undisputed that prior to 2001 MetLife did not have a

Training Director for the Buffalo agency and that Gabe Sorgi, a Sales Director, ran the training

classes there. (Docket No. 51 at page 16).  At the end of 2000, the Buffalo MetLife agency

merged with the Orchard Park MetLife agency.  Prior to the merger David Ungaro had served as

Training Director for MetLife's Orchard Park office.  After the merger, Ungaro retained his

position as Training Director for the merged agency.  In mid-2001, Ungaro stepped down from

his management position.  It is undisputed that Capobianco determined not to replace Ungaro

with a full-fledged Training Director, but instead to split Ungaro's duties between several people.

(Docket No. 51 at page 17; Docket No. 68 at ¶ 8).  Although the training duties were largely

performed by the Sales Directors, in October of 2001 the title of "Training Director" was given to

David Kuster.  It appears undisputed that Kuster, who was hired as a sales representative, was not

effective in that position and was about to be terminated.  It was determined that because he was

knowledgeable in technology and computers,  he could serve a limited function of teaching sales

representatives about computer software and other technology and to assist with "case prep."

Although he was given the title, it is clear that Kuster never assumed responsibility for the main

duties usually associated with a Training Director position and his salary was half of Ungaro's.

Malec does not dispute the essential factual representations regarding Kuster's appointment and

the limited scope of his duties. (Docket No. 68 at ¶ 11).  Malec did state that she was not aware

that Kuster was teaching general computer and technology use. (Malec Deposition, Docket No.

49 at page 234).  Although Malec contends that she too was familiar with MetLife's software, she

acknowledges that she was not qualified to teach sales reps how to use computers and other

technology.  (Malec Deposition, Docket No. 49 at page 243).  Further, although she distinguishes

the source of her MetLife income (apparently some of it was paid by the MetLife' corporate

parent agency and not the local agency), Malec does not dispute that she was making

23

considerably more than the salary paid to Kuster at the time he served as Training Director. (Docket No. 68 at ¶ 13).  Malec has not articulated any basis from which it could be concluded that the appointment of Kuster was made under circumstances giving rise to an inference of unlawful discrimination.   Once again, the plaintiff has failed to establish a *prima facie* case in this regard.

Kuster held the Training Director title for less than 12 months. For the next year, MetLife once again had no Training Director and the training classes continued to be performed by the Sales Directors. In September of 2003, Capobianco appointed Abe Gibbons to the Training Director's position.  Like Ungaro (the previous full-fledged Training Director), Gibbons did not have a background in the insurance industry, but instead had significant experience as a teacher (Gibbons taught both high school and adult education classes).  Gibbons also had experience and academic training in curriculum development. (Docket No. 42 at ¶¶  18-19). Gibbons developed a curriculum teaching classes four days a week on a full range of topics, including sales techniques, telephone skills, product knowledge, and how to use various software and technology.[21]  To sell insurance in New York State you must first pass a licensing test.  It appears undisputed that the industry average of candidates passing the test is 35 to 50%.  According to MetLife (and undisputed by the plaintiff), when Gibbons arrived at MetLife the agency's pass rate was slightly higher than the industry average. After Gibbon's overhauled the training curriculum, MetLife's passing rate soared to 92% in 2004 and 95% in 2005. (Docket No. 42 at ¶3).  Malec does not dispute the defendant's representations of Gibbons' training and experience (Docket No. 68 at ¶¶

---

[21]   Malec does not assert that she desired to stop selling insurance or servicing her existing clients.

14-16); and she admits that she has no training or experience in teaching or curriculum development (Docket No. 68 at ¶ 17).  Notwithstanding, Malec asserts that she was more qualified for the Training Director's position because of her experience in the insurance industry. (Malec Deposition, Docket No. 49 at page 246).

Malec has not demonstrated that she was qualified for the full-fledged Training Director's position.  Notwithstanding her familiarity with MetLife products and policies, Malec has not demonstrated evidence that she possessed adequate experience in the teaching and curriculum development aspects of the position.  Moreover, Malec has articulated no circumstances giving rise to an inference of unlawful discrimination with respect to the determination to appoint Gibbons to the Training Director position (other than her self-serving assertion that she was qualified for the position).  A plaintiff's position that she considered herself more qualified is insufficient to raise a genuine issue of material fact. Fayson v. Kaleida Health, Inc., 2002 WL 31194559, *7 (W.D.N.Y.,2002). Thus, the plaintiff as failed to establish a *prima facie* case with respect to her Title VII claim relating to this position.  Even if the Court were to assume that the plaintiff had established a *prima facie* case as to her failure to be appointed to the Training Director position, MetLife has presented a legitimate, non-discriminatory basis for the determination to appoint Gibbons, and not Malec, to the post: Gibbons' training and experience in teaching and curriculum development.  The Second Circuit  has held that, "[w]hen a plaintiff seeks to prevent summary judgment on the strength of a discrepancy in qualifications ignored by an employer the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff." Id quoting  *Byrnie v. Town of Cromwell,*

243 F.3d 93, 103 (2d Cir.2001).  The plaintiff has not established or even raised a question of fact

as to whether the determination to hire an individual with teaching skill sets similar to the prior

full fledged occupant of the post (Ungaro) was a pretext to avoid hiring her because of her

gender.   The defendants' motion for summary judgment should be granted to the extent that

Malec's Title VII claim is based upon her failure to be promoted to the Training Director's

position.


Sales Manager.   Malec asserts that she should have been promoted to either of two Sales

Manager positions; one filled in 2001 and the other in 2002.  In 2001, because of increasing

business Capobianco created a new Sales Director position.  Again, it is not clear from the record

whether a posting was made for his job or if Malec applied for this specific position. In any

event, Capobianco appointed Charles Gleba to the position.  Prior to his appointment to the Sales

Director position, Gleba had 20 years of experience as a manager in the insurance industry while

employed at The Prudential Insurance Company.  During much of his time at Prudential, Gleba

served as an agency manager, a position the defendants' assert was comparable to Capobianco's

position with MetLife. (Docket No. 43 at ¶ 2; Docket No. 51 at page 23).   Gleba's prior

managerial service provided him with experience in several of the key duties associated with the

Sales Director job: recruiting, supervising recruits, and running training classes. (Docket No. 51

at page 23).  Capobianco represents that he also believed that Malec was unwilling to spend her

Thursday nights and Saturday mornings supervising group phone sessions,  which he viewed as a

mandatory duty of the Sales Director. (Docket No. 39 at ¶ 68).  Malec does not dispute Gleba's

26

prior managerial experience (Docket No. 68 at ¶ 19).  The plaintiff admits that she had less managerial experience than Gleba, but asserts that she had more experience than Gleba at MetLife. (Docket No. 68 at ¶ 20).  However, Malec contends that Capobianco's representation that he believed that Malec would be unwilling to spend Thursday evening and Saturday mornings supervising group phone sessions is evidence of his "biased and discriminatory view of women in professional positions." (Docket No. 68 at ¶ 21).   Such a conclusory statement, particularly in light of the record in this case which demonstrates that Malec's attendance at these meetings was admittedly irregular,  is insufficient to give rise to an inference of unlawful discrimination.

Even if the Court were to conclude that the plaintiff has demonstrated a *prima facie* case with respect to her failure to receive this Sales Director's position, the defendants have come forward with a legitimate, non-discriminatory basis for the decision to appoint Gleba to the Sales Director's position over Malec: his vastly superior managerial experience.  As noted above, the plaintiff does not dispute that Gleba had far more relevant managerial experience than she at the time the appointment was made (Gleba had more than 20 years managerial experience, compared to Malec's approximately 4 years of managerial experience).  The disparity between the prior managerial experience of Gleba and Malec, with Gleba possessing an overwhelming advantage, is significant.  The fact that Capobianco placed a premium on prior specific managerial experience at another agency over general non-managerial experience at MetLife does not refute the defendants argument or raise a genuine issue of material fact.  Sista v. CDC Ixis North America, Inc., 445 F.3d 161, 173 (2d. Cir.  2006)(To support plaintiff's claim that he was fired on account of his mental illness rather than his past threat to a co-worker, plaintiff pointed to

defendant's repeated invitations to return to work in the Fall of 2001 with the permission of a doctor, its failure to seek an alternative diagnosis of plaintiff's medical condition before firing him, and its failure to take certain safety precautions at the time when he was placed on involuntary leave in the Spring of 2001. Notwithstanding, the Court held that plaintiff's arguments in this regard were insufficient to raise any "genuine issue of material fact.").

The fact that Gleba possessed so much more relevant managerial experience than Malec establishes a strong legitimate basis for the determination to appoint Gleba to the Sales Director position over Malec. The plaintiff has not rebutted this legitimate basis or raised a question of fact as to whether the proffered basis was a pretext for some discriminatory basis. Further, the plaintiff has not demonstrated that this is a mixed-motives case. In <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228, 258, (1989), the Court held that if the plaintiff establishes that a prohibited discriminatory factor played a 'motivating part' in a challenged employment decision, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision anyway. "The types of indirect evidence that suffice in a pretext case to make out a *prima facie* case-or even to carry the ultimate burden of persuasion-do not suffice, even if credited, to warrant a <u>Price Waterhouse </u>burden shift." <u>Raskin v. Wyatt Co.</u>, 125 F.3d 55, 60 (2d Cir.1997)(internal quotation marks and citation omitted). "Evidence potentially warranting a <u>Price Waterhouse </u>burden shift includes, *inter alia,* policy documents and evidence of statements or actions by decision makers that may be viewed as *directly reflecting* the alleged discriminatory attitude." <u>Id</u>. at 60-61 (internal quotation marks and citation omitted) (emphasis in *Raskin* ). "[T]o warrant a mixed-motive burden shift, the plaintiff must be able to produce a 'smoking gun' or at least a 'thick cloud of smoke' to support his allegations of discriminatory treatment."

Raskin, 125 F.3d at 61.  In the instant case, Malec points to Capobianco's statement that he did not believe that Malec would be willing to work the hours associated with the Sales Director's position as evidence of a discriminatory animus. However, the evidence in the record suggests a gender-neutral reason for this belief – Malec's admitted past record of non-attendance at those meetings.  Other than her conclusory statements regarding Capobianco's animus, the plaintiff has not pointed to *any* evidence which would support a finding that Capobianco's belief that Malec was unwilling to work the extended hours associated with that position was based upon her gender.  Indeed, it is undisputed that Capobianco desired and expected female managers, including FM's such as Malec, to attend those meetings. The record does not reflect, and the plaintiff does not assert, that her irregular attendance at the meetings had anything to do with her gender.  Malec does not deny March's testimony to the effect that she had made an arrangement with March so that she did not have to attend the meetings so that she could service her clients. While she characterized her attendance at the Thursday evening meeting as "often;" and asserts that she "almost always" attended the Friday meetings, she does not make any representation as to her attendance at the Saturday meetings.  Malec has not established a question of fact that Capobianco's desire for a greater commitment regarding attendance was based upon her gender.[22]

---

[22]   The plaintiff appears to argue that Capobianco's perception of the regularity of her attendance at these meetings is not accurate.  Other than her conclusory statements, Malec has not pointed to any evidence which would suggest that any such misperception on the part of Capobianco regarding Malec's attendance at the meetings was based upon her gender. There is no suggestion in the record that Malec's attendance was tied in any way to her gender or her responsibilities as a mother. (The Court notes that at the times relevant to this lawsuit, it appears that Malec's youngest child – which was born in 1982– was approaching adulthood).  Instead, the record reflects that to the extent Malec did not attend these meetings, it was because she wanted to meet with clients or engage in recreational activities. Further, it appears undisputed that Malec did not attend the meetings with the regularity Capobianco expected of his managers.

Based upon this record, Capobianco's belief regarding Malec's willingness to attend the meetings is not the type of "smoking gun" *direct* evidence of discriminatory animus sufficient to warrant burden shifting under Price Waterhouse. Sista, 445 F.3d at 174. (Plaintiff failed to present any direct evidence of discriminatory animus based on his disability and therefore was not entitled to a Price Waterhouse burden shift.).   In sum, Malec has not established the existence of circumstances giving  rise to an inference of unlawful discrimination with respect to the determination to appoint Gleba instead of Malec to the Sales Director's position, particularly in light of Gleba's significantly superior managerial experience.

Malec has similarly failed to establish a *prima facie* case with respect to the Sales Director's  position given to Battistella, who had previously worked as a Sales Manager at Prudential prior to taking the position at MetLife.  Malec admits the following:

1.      that Capobianco was not looking to add another Sales Director in 2002;

2.      that Battistella approached Capobianco unsolicited about his interest in coming to work as a Sales Director at MetLife;

3.       that Battistella had significant managerial experience at Prudential;

4.      that Capobianco was persuaded that based upon Battistella's track record, he could recruit enough sales reps (over a reasonable time) to justify the expense of adding another Sales Director to the agency's payroll.

(Docket No. 68 at ¶ 22-24).

It is also undisputed that Battistella had eight years of managerial experience at Prudential, including four years as Sales Manager.  He was placed in a special training program to be groomed to become a Managing Director at Prudential. (Docket No. 41 at ¶ 3).  Battistella

left Prudential to work in a managerial capacity for an entity in Baltimore, Maryland called the

American General Agency Builders Group.  (Docket No. 41 at ¶ 4).  According to Battistella, for

family reasons he wanted to move back to Buffalo. (Docket No. 41 at ¶ 5). Thus, he approached

Capobianco.  According to Capobianco:

> 70.  Battistella persuaded me that over time (but not too
> long), he could hire enough new sales reps to fill a new unit.  If so,
> that would more than offset the cost of his management salary,
> especially since he would be compensated under an incentive-
> based override formula.  I decided to take a chance on him.  I
> viewed this as a "yes-or-no" decision on him.  I did not consider
> anyone else, because if I didn't hire Battistella, I wasn't going to
> add another Sales Director position at that time.  Again, I did not
> have an "opening" that I was looking to fill
>
> 71.  My agreement with Battistella was that he would
> temporarily start as an FM, until he fired three new sales reps, at
> which point I would promote him to Sales Director and put him in
> charge of his own unit.  Until then, I temporarily assigned him to
> be Gleba's assistant, helping with Gleba's unit, but that only lasted
> a few weeks.  For unrelated reasons (so far as I know), Gleba
> resigned. Battistella helped oversee that unit for several months,
> until he reached his goal of hiring new sales reps. At that point I
> promoted him to Sales Director and added additional sales reps to
> the unit.  He has grown the unit quite a bit since then, mainly with
> people he recruited.

(Docket No. 30 at ¶¶ 70-71).

Malec does not deny that Battistella had approximately twice as much managerial

experience as she (Battistella's just over 8 years to Malec's 4½ years) and that at least 4 years of

Battistella's experience was as a Sales Manager at Prudential (the duties of which were similar to

those of the Sales Director's position at MetLife).  Further, she does not dispute the

circumstances as to how Battistella came to MetLife.   Once again, the plaintiff has failed to

31

articulate any basis which would give rise to an inference of unlawful discrimination with respect to Capobianco's determination to bring Battistella into MetLife. The plaintiff has failed to establish a prima facie case with respect to this claim. In any event, the defendants have demonstrated, and the plaintiff has failed to rebut, the existence of a legitimate, non-discriminatory basis for the determination to appoint Battistella to the Sales Director's position.

Functional Manager.   Malec identifies three FM positions to which she claims she should have been appointed. With respect to the first two, those held by DiCenzo and Glofka, it is undisputed that Malec was already an FM at the time of those appointments. Arguably, these would have been lateral movements for Malec and not promotions at the time they were made and would not constitute an adverse employment action. Williams v. R.H. Donnelly Corp., 368 F.3d. 123, 128 (2d. Cir. 2004). In any event, Malec admits that she did not apply for these positions. (Malec Deposition, Docket No. 49 at page 221). Thus, she cannot establish a *prima facie* case as to these positions. Cruz v. Coach Stores, Inc. 202 F.3d. 560, 566 (2d. Cir. 2000).

Malec also claims that she should have been promoted to the FM position that went to Michael Gnacinski in 2004.[23] Once again, the record does not reflect that Capobianco posted this position or that Malec had specifically discussed the position with Capobianco. The plaintiff claims that Capobianco failed to consider her for this position even though he knew she was interested in a management position and she was better qualified for the position than Gnacinski. This position was similar to Malec's previous FM position, but in addition Capobianco expected

_____

[23]   Because of the incentive based formula instituted by Capobianco, the record does not reflect what, if any, salary would be associated with this position.

Gnacinski to have responsibility for recruiting and supervising phone sessions as part of his FM

duties. (Docket No. 39 at ¶ 74).   It appears undisputed that Malec had more experience than

Gnacinski at MetLife.  The record does not reflect whether Malec's attendance or willingness to

regularly attend the Thursday evening and Saturday morning phone sessions had changed.

However, it is undisputed that Malec had performed no better than "fair" as a manager in 2001.

(Docket No. 68 at ¶ 37).  Significantly, the record also reflects that Malec's deteriorating

relationship with Capobianco did have an impact on her ability to advise younger sales reps or to

recruit new sales reps to work with Capobianco.  It appears that her dissatisfaction with

Capobianco and the direction he was taking the MetLife agency was no secret.  Malec admits that

she told others of her problems with Capobianco (Malec Deposition, Docket No. 49 at pages 82-

83) and the record reflects that others at MetLife, including March (Docket No. 44 at ¶ 35) and

Sorgi (Docket No. 46 at ¶ 35), were aware of  her clashes with Capobianco.  The fact that she

was not on good terms with Capobianco prevented her from effectively advising younger reps on

how to succeed under Capobianco or interceding with Capobianco on their behalf if they had

difficulties with him.  (Malec Deposition, Docket No. 49 at pages 195-200). Malec's

dissatisfaction with Capobianco's leadership and the changes he was instituting constitute a

legitimate, non-discriminatory reason for an adverse employment action.  Bay v. Times Mirror

Magazines, 936 F.2d. 112, 118 (2d. Cir. 1991)(plaintiff failed to offer evidence upon which a

trier of fact could reasonably reject defendant's position that it examined plaintiff individually on

the merits and concluded that his evident dissatisfaction with the reorganization necessitated the

adverse employment action).  The record also reflects that at this time Malec was distracted by

personal problems which affected her performance and was not happy at MetLife.  In July of

2002, Malec defaulted on a home mortgage. (Malec Deposition, Docket No. 49, Exhibit M). It is undisputed that her production fell off significantly. Shortly after her default on the mortgage in 2002, Malec took a medical leave of absence due to stress which exacerbated her preexisting psoriasis condition. (Malec Deposition, Docket No. 49 at page 30-31). In 2003, she filed for bankruptcy (Malec Deposition, Docket No. 49, Exhibit N) and her sales dropped more than 50% in 2003. (Docket No. 39, Exhibit E, pages 2, 4). The record reflects that by 2004, it was apparent that Malec's dissatisfaction with Capobianco's changes impacted her performance at MetLife and made her a poor candidate for a management position under Capobianco. As discussed above, the record reflects that several MetLife employees, both male and female, left MetLife because of Capobianco's leadership style and the compensation changes he instituted. Further, also as discussed above, there is much evidence in the record reflecting Malec's dissatisfaction with Capobianco's changes to the structure of management compensation, and Capobianco's dissatisfaction with Malec's performance as an FM and her willingness to attend certain meetings. However, Malec has failed to demonstrate evidence sufficient to raise a question of fact that her gender played a role in Capobianco's actions. Thus, the plaintiff has failed to demonstrate circumstances giving rise to an inference of unlawful discrimination with respect to the 2004 FM position or to refute MetLife's legitimate basis for the failure to promote her to that position.

In sum, to the extent that the plaintiff's Title VII claim are based upon a failure to be promoted, the plaintiff's claims must fail inasmuch as she has not demonstrated a *prima facie* case with respect to any specific position or has failed to rebut the defendants' demonstration of a legitimate, non-discriminatory basis with respect to each of the challenged determinations.

**Equal Pay Act and Labor Law Claims**

Malec claims that she was not paid as much as her male counterparts for substantially similar work at MetLife.

The EPA prohibits an employer from discriminat[ing] ... between employees on the basis of sex by paying wages to employees ... at a rate less than the rate at which he pays wages to employees of the opposite sex ... for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions ... . 29 U.S.C. § 206(d)(1). As indicated by the statutory language, "[a] violation occurs when an employer pays lower wages to an employee of one gender than to substantially equivalent employees of the opposite gender in similar circumstances." Pollis v. New School for Social Research, 132 F.3d 115, 118 (2d Cir.1997).  While claims for wage-discrimination under the EPA and under Title VII are quite similar, see Tomka v. Seiler, 66 F.3d 1295, 1312 (2d Cir.1995) ("A claim of unequal pay for equal work under Title VII ... is generally analyzed under the same standards used in an EPA claim"), the most noteworthy difference between the two is that the EPA does not require the plaintiff to make a showing of discriminatory intent. See id. at 1310. For wage discrimination claims brought under the EPA, the plaintiff must offer evidence indicating that she was paid by her employer less than what the employer paid to male employees performing substantially equivalent work. See Lavin-McEleney v. Marist College, 239 F.3d 476, 480 (2d Cir.2001); Tomka, 66 F.3d at 1310.

Once a plaintiff has made out a prima facie case, the statute allows the employer the opportunity to invoke one or more of four enumerated affirmative defenses-that the wage

differential was the product of a "merit system", that it was produced by a bona fide seniority system, that it resulted from "a system which measures earnings by quantity or quality of production", or that it was attributable to "any other factor than sex." See 29 U.S.C. § 206(d)(1); Ryduchowski v. Port Authority of New York and New Jersey, 203 F.3d 135, 142-43 (2d Cir.2000); Sedotto v. Borg-Warner Protective Services Corp., 94 F.Supp.2d 251, 267 (D.Conn.2000). When invoking any of these defenses, the employer bears the burden to prove that the wage disparity is justified by one of these four reasons. See e.g., Belfi, 191 F.3d at 136; Aldrich v. Randolph Central School District, 963 F.2d 520, 525 (2d Cir.1992); Downes v. JP Morgan Chase & Co., 2006 WL 785278, at 15 -16 (S.D.N.Y.,2006).

The plaintiff's claim under New York law is analyzed under the same standards applicable to the federal Equal Pay Act. See Kent v. The Papert Companies, Inc., 309 A.D.2d 234, 246, 764 N.Y.S.2d 675 (1st Dept.2003); Mize v. State Div. of Human Rights, 33 N.Y.2d 53, 56, 349 N.Y.S.2d 364, 304 N.E.2d 231 (1973); Pfeiffer v. Lewis County, 308 F.Supp.2d 88, 98 (N.D.N.Y.,2004). Accordingly, the following analysis addresses Malec's claims under both statutes.

The parties have stipulated that under the applicable statute of limitations Malec cannot maintain an EPA claim regarding compensation prior to December 31, 2001. (Docket No. 19 at ¶ 2).  However, under the New York Labor Law, she can pursue an equivalent claim going back to 1996.  (Docket No. 19 at ¶ 4).

The plaintiff's claims in this regard focus on the management pay she received between 1999 and the first quarter of 2002. (Docket No. 57 at ¶¶ 20-25).  The plaintiff does not identify

36

any male comparators in her complaint.  In her affidavit in response to the instant motion, Malec

identifies the following comparators: Ken Wolf, David Jones, Frank Diulus, Jacob Glofka,

Dominic DiCenzo, David Kuster, Charles Gleba, and Bruce Supernault. (Docket No. 57 at ¶¶ 21-

24).

It appears undisputed that in the years from 1999 to 2001[24], Malec received **_higher_** total

management pay than each of the male FMs identified by the plaintiff. That includes Wolf, Jones,

Glofka, DiCenzo, Diulus, and Kuster. (Docket No. 51 at pages 48-50).  The defendants had

anticipated that the plaintiff would argue that the Court should look only at the portion of her

total management salary that was attributed to her FM duties, and to discount any management

salary designated for her service as a mentor. (Docket No. 51 at page 50).   Instead, the plaintiff's

deposition makes it clear that it is not disputed that Malec negotiated an overall management

salary to encompass her managerial duties and that she did not care how it was attributed between

her status as an FM and as a mentor.[25]  Further, she acknowledges that she continued to get her

entire management salary even after she no longer functioned as a mentor. (Docket No. 49, Malec

Dep. No. 1 at pages 101-103).  In her response to the instant motion, however, the plaintiff does

not assert this anticipated argument.  The plaintiff does not dispute the salary figures presented by

---

[24]   There appears to be a dispute as to whether Malec performed any management
function in 2002.  She asserts that she supervised an entire unit in the first quarter of that year.
(Docket No. 57 at ¶ 20).  In any event, as of the first quarter of 2002, Capobianco's new
incentive based management pay system was implemented for all FMs. The salary figures for
that quarter do not appear to be in the record.  However, the plaintiff does not identify any male
comparator for that quarter and fails to present a factual basis for an EPA claim for that period.

[25]   As noted above, the plaintiff does not dispute that she negotiated a single management
salary with March; nor does she dispute the defendants' rationale as to the attribution of the
plaintiff's managerial salary between the FM and mentor designations.

the defendants.  Indeed, the plaintiff's Memorandum of Law in opposition to the instant motion devotes barely one page to defending her equal pay claims. (Docket No. 70 at pages 17-18). Further, she acknowledges that "there was no single standard defining the job of functional manager" and that Malec performed a number of duties that were "characteristic of the position." (Docket No. 70 at page 17).  In any event, it appears undisputed that Malec received *more* management salary than any male FM for the years 1999 through 2001.  Thus, her claims in this regard must fail.

The plaintiff's claims are equally specious as they relate to the full-time manager positions held by Gleba and Supernault.  It is undisputed that both of these individuals functioned as full-time Sales Directors who had additional duties compared to hers.  The plaintiff's Memorandum of Law in response to the instant motion does not even attempt to argue that her position as an FM was the equivalent to the Sales Directors' position.  Although the plaintiff asserts that she performed some of the duties performed by the Sales Directors (i.e. she did some recruiting and some training)(Docket No. 68 at ¶ 46), the record reflects that the plaintiff was not responsible for these functions to the same extent as the Sales Directors.  The record also reflects that the Sales Directors also played a significant role in making hiring decisions and disciplining sales reps. (Sorgi Affidavit, Docket No. 46 at ¶¶  8-14).   Indeed, Malec acknowledges that her FM position was different than the Sales Director's position:

A:      Functional Manager is a sales rep.  It's not a manager.  It's not a director.

Q:      Well, what's the difference?

A:      Rocco is a director. Gabe Sorgi is a director. Don March was a director. There's a difference between compensation and duties between a director and a functional manager.

(Docket No. 49 at page125).   One of the differences acknowledged by Malec was the responsibility to supervise phone sessions. (Docket No. 128). Finally, the plaintiff does not dispute that Supernault was in charge of building a financial planning department within the agency – including hiring people to work in that department.  (Sorgi Affidavit, Docket No. 46 at page 32).  Malec does not allege that she performed any of those functions and admits that she was not qualified to perform them. (Malec Deposition, Docket No. 49 at page 255-256).  Thus, the plaintiff has not established a *prima facie* case with respect to her equal pay claims as to these alleged comparators.

Based on the above, to the extent the defendants seek summary judgment with respect to the plaintiff's unequal pay claims, the motion should be granted.


**Retaliation Claims**

The plaintiff alleges numerous acts of alleged retaliation in her complaint. In order to establish a prima facie case of retaliation, the plaintiff must show that: (1) she engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity. Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir.2002). Schiano v. Quality Payroll Systems, Inc., 445 F.3d 597, 608 (2d. Cir. 2006).

Between the complaint and the subsequent discovery in this matter, it appears that Malec has asserted the following retaliatory events: (1) that MetLife withdrew some commission credits from her (Complaint at ¶ 102(g)); (2) that Capobianco excluded her from managerial meetings

(Docket No. 74-75); (3) that she received undesirable zip codes in the Deliver the Promise initiative and removed her from the program (Complaint at ¶ 102(a)); (4) that Capobianco threatened to exclude her from a group photo to be printed in *Buffalo Spree* magazine (Complaint at ¶ 102(b)); (5) that Capobianco took away her secretary (Complaint at ¶ 102(c)); (6) that Capobianco buried her in paperwork (Complaint at ¶ 102(m)); (7) that Capobianco caused her mail to be misdelivered (Complaint at ¶ 102(d)); (8) that she was forced to pay for alcohol at a client seminar (Complaint at ¶102(j)); (9) that Capobianco transferred a client out of Malec's account (Complaint at ¶ 102(I)); (10) that Capobianco orally reprimanded the plaintiff for allowing her clients to consume alcohol at the seminar (Complaint at ¶ 102(k)); (11) that Capobianco refused to sign a bonus check to Malec (Complaint at ¶ 102(e)); (12) that DiCenzo's position was awarded to a male in July of 2002 (Complaint at ¶(f)); (13) that Capobianco sent letters to Malec's clients after she resigned from MetLife (Malec Deposition, Docket No. 49 at pages 279-280).[26]

It is undisputed that the first instance of protected activity taken by Malec was her filing of a charge against MetLife with the Equal Employment Opportunity Commission ("EEOC") on May 30, 2002. It appears that several of the events asserted as retaliatory incidents by the

---

[26] The plaintiff appears to employ an expansive definition of retaliation. At her deposition she testified as follows:

Q:   What do you understand the word retaliation to mean?
A:   Making your life difficult.
...
Q:   Suppose Rocco just doesn't like you, just doesn't like you for reasons completely unrelated to your being a women and he does something to make your life difficult. would you consider that retaliation?
A:   Yes.

40

plaintiff occurred prior to this date.  For example, with respect to the plaintiff's claim that

MetLife unjustifiably withdrew certain commission credits from her, Malec testified that this did

not occur between 2000 and 2004, but instead occurred "back in the nineties." (Malec

Deposition, Docket No. 49 at 272).  Similarly, her allegations that Capobianco excluded her from

managerial meetings relate to meetings which took place in October and November of 2001 (see

Complaint at ¶83; Malec Deposition, Docket No. 49 at page 74), several months prior to her

protected activity.  The assignment of zip codes as part of the Deliver the Promise initiative

admittedly took place in March of 2002 (Malec Deposition, Docket No. 49 at page 282-283), also

before Malec's protected activity.[27]  Finally, the incident in which Capobianco allegedly

threatened to exclude her form the *Buffalo Spree* picture occurred in April of 2002 (see

Complaint at ¶¶ 102(b)) also before any protected activity by the plaintiff.  The plaintiff does not

address this temporal argument in her response to the instant motion.[28]  It appears that the

---

[27]   Malec also asserts that she was forced out of the Deliver the Promise initiative.
However the record reflects, and Malec does not dispute, that to remain in the program each
member was required to pay a fee.  Malec does not dispute that she refused to pay the fee; that
she was sent a letter from Bill Moore in June of 2003 advising her that if she did not pay the fee
she would be removed from the program.  Notwithstanding this notice, Malec does not dispute
that she did not pay the fee. (Malec Deposition, Docket No. 49 at pages 288-289).  The plaintiff
has not articulated any factual basis to maintain that her removal from the Deliver the Promise
initiative under these circumstances was retaliatory.

[28]   The plaintiff's Memorandum of Law in response to the instant motion devotes just
over two pages defending all of her retaliation claims.  In this regard, the plaintiff's papers set
forth the legal standard (one paragraph); restate the retaliatory events as listed in the Complaint;
and concludes with two paragraphs of general statements to the effect that Capobianco treated
Malec "offensively" and that a number of affiants describe Malec as someone who "stood up" to
Capobianco. (Docket No. 70 at page 20).  The plaintiff does not address the specific arguments
asserted by the defendants in this motion. The Court notes that the plaintiff's Response to the
Defendants' Rule 56.1 Statement (Docket No. 68) does contain minimal argumentation and
comment as to *some* of the factual assertions by the defendants.

plaintiff concedes that each of these allegations must fail. <u>Gregory v. Daly</u>,  243 F.3d 687, 701

(2d. Cir. 2001)(we must omit from consideration those episodes of harassment that preceded her

protected activity since prior harassment could not have been in retaliation for acts not yet taken).

See also <u>Pinero v. Long Island State Veterans' Home</u>, 375 F.Supp. 2d 162, 168 (E.D.N.Y. 2005);

<u>Tone v. U.S. Postal Service</u>, 68 F.Supp. 2d 147, 153 (N.D.N.Y. 1999) aff'd 242 F.3d. 368 (2d.

Cir. 2000).

Malec claims that Capobianco took away her personal secretary.  The defendants assert

that until mid-2002, the plaintiff had a part-time personal marketing assistant ("PMA"), Brandi

Nolan,  who performed much of the paperwork associated with Malec's sales.  Nolan also

worked for Lowell Chick, Gabe Sorgi and Don March at this same time.  (Docket No. 45 at ¶ 2).

Nolan's salary was paid by the individuals she worked for, however, MetLife would pay for

Nolan's benefits (such as social security, etc.).  (Docket No. 51 at page 61-62).  In June of 2002,

MetLife made a national change in its policy and ceased to pick up the costs of the benefits paid

to the PMA's.  According to Nolan, Capobianco and Collette Forrest held a meeting to announce

that MetLife would be terminating the employment of all PMAs. If a sales rep wanted to use a

PMA. The sales rep would have to pay the PMA's salary directly.  To continue working as a

PMA with MetLife, the assistant would have to become affiliated with Kelly Services, Inc.

(Docket No. 45 at ¶ 3).  After the announcement, Nolan testified that she asked March whether

she could continue to work for him. He agreed to continue to utilize her as a PMA. At this same

time, two other MetLife sales reps, Marty Maloney and Dave Jones also asked her to work for

them.  (Docket No. 45 at ¶ 4).  Malec does not allege that she asked Nolan to stay on as her PMA

or that she agreed to pay the entirety of her salary after the change in policy.  Indeed, Malec has

articulated no factual basis for her conclusion that Capobianco "took way" Nolan.  Nolan states

that she agreed to work for March, Maloney and Jones.  Nolan testified that "Rocco Capobianco

was not involved in my decision to work for March, Maloney and Jones" and that "Rocco had no

input into my decision at all." (Docket No. 45 at ¶ 4).

Malec also fails to establish a *prima facie* case with respect to her claim that Capobianco

"buried her in paperwork."  Malec had testified that Nolan had spent 10 to 20 hours per week

assisting her with the paperwork. It appears that because Malec no longer had a PMA to assist her

with the paperwork associated with her sales,  she now had to perform all that work for herself.

Malec has articulated no factual basis to attribute this problem to Capobianco (or anyone else at

MetLife) or as being connected in any way to her protected activity.

Several of the events alleged by Malec appear to be too trivial to constitute an adverse

employment action.  For example, Malec alleges that one letter addressed to her was not routed to

her. (Malec Deposition, Docket No. 49 at page 267-268).  Malec cannot present any evidence as

to who was responsible and has not articulated that there was any meaningful consequence as a

result of the isolated misdirection.  Similarly, in October of 2002, MetLife ran a seminar for

clients at a local hotel.  Malec admits that at least one of her clients helped himself to alcoholic

beverages for which the hotel charged MetLife.  Capobianco demanded that Malec reimburse

MetLife for the entire bill (approximately $70).  Although Malec contended that other people

were drinking also (Malec Deposition, Docket No. 49 at page 274), she wrote a check and gave it

to March.  It appears that Capobianco decided not to cash the check.  Thus, Malec did not lose

any money as a result of the incident.  (Malec Deposition, Docket No. 49 at page 276).  Malec

was also reprimanded by Capobianco on two occasions: one relating to the alcohol consumption

by her clients at the seminar and on a second occasion for using unprofessional language (that she was "pissed off") in a discussion with March.  A reprimand fails to qualify as an adverse employment action unless it leads to harsher discipline. District Courts in this Circuit have consistently held that warnings and reprimands, standing alone, do not generally constitute adverse employment action for purposes of Title VII.  Williams v. Timberlodge Steak House, 2005 WL 189726, at *6 (W.D.N.Y. 2005)(Skretny, J.) citing Bennett v. Watson Wyatt & Co., 136 F.Supp.2d 236, 246-48 (S.D.N.Y.2001)(collecting cases). Where negative evaluations do not lead to immediate tangible harm or consequences, they do not constitute adverse actions materially altering the conditions of employment. Valentine v. Standard & Poor's, 50 F.Supp.2d 262, 284 (S.D.N.Y.1999), aff'd, 205 F.3d 1327 (2d Cir.2000).  It appears that the plaintiff concedes this argument inasmuch as she does not address this issue in her papers.

Malec also lists, as a retaliatory act, the fact that Capobianco "refused to process" plaintiff's quarterly bonus check for the second quarter of 2002.  At her deposition she acknowledged that Capobianco did not actually refuse to sign a check and did not deny her a bonus, but instead he refused to sign a form which would have allowed her to receive her bonus in a lump sum rather than in monthly installments. (Malec Deposition, Docket No. at page 270). It appears that in July of 2002, the plaintiff requested that Capobianco retroactively change the payment method from installments to lump sum for the bonus relating to the second quarter (April to June). Malec admits that the form she asked Capobianco to sign expressly stated that "retroactive adjustments are not available"  (Malec Deposition, Docket No. 49 at page 301), but insists that Capobianco should have signed it anyway.  In essence, the plaintiff was forced to continue to receive her bonus in monthly installment for that quarter.  The plaintiff has not

44

presented authority supporting the proposition that this constitutes an adverse employment action; nor has the plaintiff presented any facts supporting the finding of a nexus between this act and any protected activity on her part.

In September of 2003, Capobianco transferred a large client out of plaintiff's book of business.  Capobianco states that he did so based upon a conversation with an individual in the client's family. (Docket No. 39 at ¶ 80).  As soon as it was discovered that the client did not wish to be transferred from Malec's account, the client was restored to Malec's book of business. It is undisputed that the client was out of Malec's account for approximately two weeks. Malec has not articulated a factual basis that she suffered any adverse consequence as a result of the improper temporary transfer.  Once again, the plaintiff's papers fail to address this issue or to present authority for the proposition that the temporary transfer of this account (without consequence to the plaintiff) constituted an adverse employment action.

Malec also alleges that the failure of Capobianco to promote her to a Sales Director's position in July of 2002 was retaliatory.  Once again, the plaintiff merely sets forth conclusory allegations and does not attempt to articulate a factual basis to support the claim.  In July of 2002, Capobianco hired Battistella.  As discussed above, the plaintiff does not dispute the circumstances regarding Battistella's hiring; that Capobianco was not looking to hire another Sales Director, that Battistella approached Capobianco; and that Battistella had considerably more relevant managerial experience than Malec. The record also reflects that Capobianco was not convinced that Malec would attend the Thursday evening and Saturday morning phone sessions required of this position.  Again, the plaintiff's motion papers do not address the defendants' specific arguments in this regard or articulate a basis for finding that the failure to

45

promote the plaintiff to this position was related to her protected activity.

Finally, the plaintiff alleges that Capobianco retaliated against her by sending letters to her clients after Malec resigned from MetLife to join one of their competitors.  Malec resigned from MetLife in April of 2004.  Shortly after that, Capobianco sent a form letter to the clients she serviced. According to Capobianco, the letters were copied directly from a MetLife manual. (Docket No. 39 at ¶ 82).  Malec does not dispute this.  The entirety of the body of the letters state as follows:

> We wish to inform you that Diana Malec no longer represents MetLife, her employment with the company having terminated on April 26, 2004.  Accordingly, she is not authorized to accept premiums or transact business of any kind on our behalf.
>
> Periodically, it comes to our attention that some salespeople representing other insurance companies suggest canceling existing insurance policies and applying for new insurance.  This practice is known as "replacement" and sometimes, is done by "freezing" the present policy or applying its values, or future premiums that would have been paid on it, towards a newly purchased policy.
>
> If a representative from another company suggests that you cash surrender, borrow upon, or change your premium payments on your present MetLife policy, immediately contact our office at (716) 650-6474, and we will provide any information needed to assist you in comparing benefits and making the right decision.

(Docket No. 49, Exhibit 44).

All MetLife sales reps are supposed to sign a non-compete agreement.  It appears that either Malec either did not sign one, or that if she did, it has been lost. (Docket No. 49 at page 330).  After Malec resigned from MetLife, the company had an obvious legitimate business interest in contacting the current MetLife clients serviced by Malec and attempting to secure their business.  The plaintiff does not suggest any language in the letter is false, but suggests that the

letters were "couched in language designed to make it appear that she had been fired by

MetLife." (Docket No. 68 at ¶ 62). The language of the letter does not necessitate such an

inference.  In any event, the plaintiff has not demonstrated discriminatory animus inasmuch as it

is undisputed that the letters were copied directly out of a MetLife manual.   The plaintiff does

not articulate any factual basis to conclude that it was improper for MetLife to send the letters or

that the letters were sent in retaliation for her protected activity and not for the legitimate purpose

of securing the business of those existing MetLife clients.  Again, the plaintiff fails to address

this issue in her responding papers.

In sum, the plaintiff has failed to demonstrate a *prima facie* case with respect to any of her

claims of retaliatory conduct on the part of the defendants.  To the extent the defendants seek

summary judgment in this regard, the motion should be granted.


**Other Disparate Conduct**

The plaintiff alleges, in general terms, that male employees received more "leads" than

she did.  The defendants move for summary judgment to the extent that this allegation serves as

the basis of Malec's Title VII and New York State Human Rights Law claims. (Docket No. 51 at

pages 70 -79).  Again, the plaintiff's Memorandum of Law in response to the instant motion does

not discuss the defendants arguments in any way.

It appears that there are several types of leads: ordinary leads or "cold calls"; "e-leads"

(that come in over the computer); "orphaned business" (clients who were not assigned to anyone

because their old sales rep died or left MetLife); Deliver the Promise initiative leads; agent of the

day leads (when people call the general MetLife number and ask to speak to someone who is

47

available); and  ESS leads (institutional leads when a company or plant lays off a significant number of people and the laid-off individuals may have to transfer 401K accounts into some other qualified retirement vehicle).

It is undisputed that the ordinary leads or cold-calls typically went to newer sales reps. The plaintiff's deposition testimony makes it clear that she was not interested in these types of leads. (Malec Deposition, Docket No. 49 at pages 61, 86).  It appears that these leads are generated at the Thursday evening phone sessions which the plaintiff attended only occasionally. (Docket No. 51 at page 72).  Similarly, the plaintiff acknowledged getting e-leads but testified that these leads were not productive. (Malec Deposition, Docket No. 49 at page 323, 326-327). Malec admits that she voluntarily dropped out of the "agent of the day" because those leads were unproductive.  (Malec Deposition, Docket No. 49 at page 325-326).

The plaintiff does not dispute that the Deliver the Promise ("DTP") program and the ESS program were only open to a few sales reps at each agency.  The plaintiff's allegations with respect to the ESS program are vague at best.  She acknowledges that she did receive ESS leads on one occasion (Malec Deposition, Docket No. 49 at page 321), but states that she did not receive leads on two or three other occasions when ESS leads came into the Buffalo agency. (Malec Deposition, Docket No. 49 at page 322).  Although her testimony suggests that she has a document that contained an example of when the ESS lead came in and who it went to, the plaintiff's responding papers do not identify this document.  In any event, at her deposition, the plaintiff testified that she does not know who participated in the ESS leads or whether they lead to any sales. (Malec Deposition, Docket No. 49 at pages 322- 323).  Once again, the plaintiff has not met her burden to establish a *prima facie* case with respect to this claim.

In 1999, when the DTP program began, the Buffalo agency was limited to designating two participants.  Ken Wolf and Margarita Wood were chosen as the two sales reps to participate in the program and were each given a series of zip codes to work in. Wood eventually quit the program.  Capobianco persuaded MetLife's corporate office to allow him to designate five new reps to join the program. Malec and four others were designated.  Although Malec had assumed that she and the others would meet to divvy up Wood's zip codes, it is undisputed that the agency's Marketing Director, Jon Cummins, unilaterally distributed the zip codes among the five new participants.  It appears that Malec's assertion of disparate treatment is based upon the fact that Wolf received more DTP zip codes than she did; and the fact that the zip codes she received were far away from her home.  The record reflects that Wolf received more leads because, as an original participant in the DTP program, he was allowed to keep the entirety of his original territory.  The plaintiff does not articulate any basis to suggest that there was any discriminatory animus with respect to this determination. Similarly, although Malec was not happy that the zip codes she received were far from her home, she again cannot point to any evidence suggesting the existence of discriminatory animus in this regard. According to Wolf, all DTP newcomers "were assigned zip codes far away." (Docket No. 47 at ¶ 5).  Malec admits that she doesn't know which zip codes were assigned to males who joined the DTP with her in 2002. (Malec Deposition, Docket No. 49 at page 286-287).  Again, the plaintiff has failed to articulate circumstances giving rise to an inference of unlawful discrimination with respect to the DTP program.

Finally, with respect to "orphaned accounts," the defendants contend that the distribution

of the orphaned accounts since December 31, 2000[29] shows that Mike Shriver received 2,683 accounts; Jackie Leppert received 2,405 accounts; Ken Wolf received 371 accounts, and Malec received 341 accounts, with the remaining sales reps receiving less than Malec.  (Docket No. 51 at page 76).  Two of the top four, Leppert and Malec, are women.  All but one of the eight sales reps who received fewer accounts than Malec are males. The orphaned accounts were distributed to 11 sales reps.  While only 3 of the 11 were women, the women sales reps were given more than 40% of the orphaned accounts.  The plaintiff does not appear to dispute this breakdown. Indeed, the plaintiff's responsive Memorandum of Law does not even address the orphaned accounts claim.  This breakdown does not evidence a disparate distribution of the "orphaned accounts."   The plaintiff has failed to establish a *prima facie* case with respect to this claim as well.

**Tortious Interference Claim**

The sole basis asserted by the plaintiff for this claim in the Complaint is that by denying her promotions, leads and other advantages while she was employed by MetLife, that the defendants tortiously interfered with her economic advantages and business relations.  It has been held that a plaintiff cannot maintain a tortious interference against her employer because the employer is a necessary party to the alleged employment contract. An employer cannot be liable for interfering with its own relationship with its employee. Albert v. Loksen, 239 F.3d. 256, 274 (2d. Cir. 2001)(the tort of interference with an employment contract cannot lie against the

---

[29]   It is undisputed that the plaintiff is barred by the applicable statute of limitations from making a claim proceeding that date.

employer because it is a party to the alleged employment contract.)  Similarly, this claim cannot

lie as against Capobianco because it is undisputed that at all time he was acting in his capacity as

an agent of MetLife.  (Complaint at ¶ 144).  A tortious interference claim may not lie against

agents of the employer absent a showing that they acted outside the scope of their authority.

Finley v. Giacobbe, 79 F.3d. 1285, 1295 (2d. Cir. 1996).  Once again, the plaintiff's responsive

Memorandum of Law does not address this claim whatsoever.

Based on the above, this claim must be dismissed in its entirety.[30]


**Conclusion**

Based on the above, it is recommended that the defendants motion for summary judgment

be granted in its entirety.  Pursuant to 28 USC §636(b)(1), it is hereby ordered that this Report &

Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the

Report & Recommendation to all parties.

ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of

this Court within ten(10) days after receipt of a copy of this Report & Recommendation in

accordance with 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil

Procedure, as well as WDNY Local Rule 72(a)(3).

FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION

---

[30]   Although the defendants address it in their papers, the plaintiff has not pled a tortious
interference claim relating to the letters sent by MetLife to the clients she was servicing after she
resigned from MetLife.  Malec admits that MetLife, not the plaintiff, owns the relationships with
the clients she handled on MetLife's behalf. (Malec Deposition, Docket No. 49 at page 332). In
any event, the Court declines to address this theory inasmuch as it is not advanced by the plaintiff
in the Complaint or in the motion papers relating to the instant motion.

WITHIN THE SPECIFIED TIME,  OR TO REQUEST AN EXTENSION OF TIME TO FILE

OBJECTIONS, WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT ORDER BY THE

DISTRICT COURT ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.

Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed2d 435 (1985); F.D.I.C. v. Hillcrest

Associates, 66 F.3d 566 (2d. Cir. 1995); Wesolak v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988);

see also 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure,

and WDNY Local Rule 72(a)(3).

Please also note that the District Court, on *de novo* review, will ordinarily refuse to

consider arguments, case law and/or evidentiary material which could have been, but was not,

presented to the Magistrate Judge in the first instance.  See Patterson-Leitch Co. Inc. v.

Massachusetts Municipal Wholesale Electric Co., 840 F.2d 985 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to WDNY Local Rule 72.3(a)(3), "written

objections shall specifically identify the portions of the proposed findings and recommendations

to which objection is made and the basis for such objection and shall be supported by legal

authority."  Failure to comply with the provisions of Rule 72.3(a)(3)may result in the District

Court's refusal to consider the objection.

So Ordered.

/s/ Hugh B. Scott

United States Magistrate Judge
Western District of New York

Buffalo, New York
September 8, 2006